# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## CENTRAL DIVISION

GWENDOLYN BENNET,        )
                                     )
            Plaintiff,         )
                                     )
            v.              )       Case No. 04-4222-CV-C-NKL
                                     )
CARL'S TOWING, L.L.C.       )
                                     )
           Defendant.     )

## ORDER

Pending before the Court is Defendant Carl's Towing, L.L.C.'s ("Carl's Towing") Motion for Summary Judgment. For the reasons set forth below, Defendant's Motion is granted in part and denied in part.

Also pending before the Court is Plaintiff Gwendolyn Bennett's ("Bennett") Motion for Summary Judgment. For the reasons set for below, Plaintiff's Motion is granted in part and denied in part.

## I.    Factual Background

For approximately ten years from the mid 1980s to the mid 1990s, Plaintiff Gwendolyn Bennett and her husband owned a towing business in Wentzville, Missouri. Bennett was the sole dispatcher for her company and worked virtually around the clock; she did not draw a salary. In the mid 1990s, Bennett suffered a stroke which left her legally blind. As her husband's health was also deteriorating, the couple closed their

1

business and moved to Columbia, Missouri, to be near the University Hospital. They both received Social Security disability income. Bennett's husband died in September 2000.

Bennett's husband's cousin, Carl McMeans ("McMeans"), operates Carl's Towing, a towing company in Columbia, Missouri. Before he died, Mr. Bennett asked McMeans to hire his wife, but Bennett did not begin working at Carl's Towing until June 2001, after her husband's death. Initially, Bennett served as the dispatcher at the company office from 8:00 a.m. to 5:00 p.m. on Saturdays and Sundays. After a couple of weeks, she also began working out of her home as the night dispatcher from 5:00 p.m. to 8:00 a.m., five nights a week (Sunday through Thursday nights). This pattern continued from mid-2001 to the end of 2002, when Bennet cut back her night dispatching duties to four nights per week (Monday through Thursday nights). She continued working both weekend day shifts and four weeknight shifts until her termination in May 2004.

When she was hired, Bennett told McMeans that her disability payments would decrease if she made more than about $1200 per month. For her nine-hour weekend shifts, Bennett was paid $40 cash per shift ($80 total), which she would often take from the cash drawer herself and leave a receipt. For her weeknight shifts, she was paid regularly through a payroll company at a rate of $41.20 per night, or $206 per week if she worked all five nights. McMeans initially instructed the payroll company to pay Bennett $40 per night, the same as she was paid on the weekend shifts; however, he was advised by the payroll accountants that they had to pay her $41.20, which was equal to eight hours

2

at $5.15 per hour, the minimum wage allowed by the Fair Labor Standards Act. She was paid this wage irrespective of the number of calls received or the amount of time she actually spent working. At some point, Bennett asked why her nightly pay was based on an eight-hour shift at minimum wage when she was actually responsible for the phones for fifteen hours a night. She was told that it was the going rate. She did not report the $80 cash payments she received each weekend to the Social Security Administration.

Although she was responsible for answering the phone and dispatching tow-truck drivers for fifteen hours each weeknight she worked, she would only receive an average of ten calls per night. Each call lasted about thirty minutes from the initial answer to the arrival of the truck, during which time Bennett was responsible for keeping track of the customer and the truck. Some of these calls overlapped, so that Bennett was occasionally keeping track of more than one customer at a time. On average, she was on the phone or radio five hours per night. During the rest of her time, she would watch television, eat, crochet, or sleep (as long as the sound of the phone would wake her). Her phone was equipped with "call waiting" so she could also speak to family or friends without tying up the line. Bennet had phones on both the first and second floor of her home, but not in the basement. The radio for dispatching drivers was located in her bedroom upstairs. Consequently, she could move about on either the first or second floors and still answer the phone, though she would have to go upstairs to the bedroom to dispatch a driver. She would then record the time each call was received in a log book. She could not do laundry or any other activity in the basement during the fifteen hours she was responsible

3

for the phones. Most of the time she remained in the upstairs bedroom where her television was.

Bennett's employment was terminated in May 2004 for failing to answer calls. She subsequently filed a complaint with the U.S. Department of Labor (DOL) seeking back pay for all the hours she was on dispatch duty each week in excess of the forty hours for which she was paid $5.15 per hour. After an investigation, the DOL directed Carl's Towing to pay Bennett $3,378.40 under the Fair Labor Standards Act for weekend overtime. Carl's Towing tendered a check to Bennett for $2,094.90 (the amount owed after appropriate taxes were withheld), but Bennett refused the check and filed this action instead.

## II. Discussion

### A. Carl's Towing's Motion for Summary Judgment

#### 1. Overtime Liability for Work at Home

Carl's Towing asserts that Bennett is not entitled to additional compensation for her weeknight dispatching shifts because she falls within the "homeworker's" exception to the minimum wage and overtime provisions of the Fair Labor Standards Act, 29 U.S.C. §§ 201 et seq. ("FLSA"). Because the Court finds that Bennett's weeknight shifts do fall within the homeworker's exception, Defendant's Motion for Summary Judgment With Respect to Plaintiff's Claim for Overtime Compensation for Her Home-based Dispatching Work is granted.

The FLSA mandates that covered employers pay their workers a minimum hourly

4

wage of $5.15 for the first forty hours worked per week, 29 U.S.C. § 206(a)(1) (2005), and an overtime rate of at least one and one half times the hourly rate for any additional hours, 29 U.S.C. § 207(a)(1) (2005). These standards envision workers who clock in at a specific time and work more or less continuously until they clock out. *Halferty v. Pulse Drug Co.*, 864 F.2d 1185, 1189 (5th Cir. 1989) (*Halferty II*). However, because not all employees are required to work continuously, "the courts have fashioned the so-called . . . 'homeworker's' doctrine[] to make it possible to determine the compensation that such workers deserve under the FLSA." *Id.* This "homeworker's" exception, now codified in Department of Labor regulations at 29 C.F.R. § 785.23 (2005), "may allow an employer to pay an employee according to a reasonable compensation agreement instead of the FLSA's specific hourly rate requirements when the employer cannot determine the exact hours that the employee works." *Id.* Thus, determining the applicability of the "homeworker's" exception to a given case involves a two-step inquiry. First, does the employee who works at home come within the ambit of the "homeworker's" exception? And second, is the agreement as to the alternative system of compensation reasonable in light of all the pertinent facts?

### a. Scope of the Homeworker's Exception

To answer the first question, the Court must look to the regulation and the case law interpreting it. The regulation reads in pertinent part:

> § 785.23 Employees residing on employer's premises or working at home.
> An employee who resides on his employer's premises on a permanent basis or for extended periods of time is not considered as working all the time

5

he is on the premises. Ordinarily, he may engage in normal private pursuits and thus have enough time for eating, sleeping, entertaining, and other periods of complete freedom from all duties when he may leave the premises for purposes of his own. . . . This rule would apply, for example, to the pumper of a stripper well who resides on the premises of his employer and also to a telephone operator who has the switchboard in her own home.

29 C.F.R. § 785.23 (2005). Although the regulation itself mentions employees who "work on their employer's premises," the regulation's caption implies, and the Eighth Circuit has held, that it applies equally to employees who work from their own homes. *Rudolph v. Metropolitan Airports Commission*, 103 F.3d 677, 681 (8th Cir. 1996). The key issue is whether the employee has "periods of complete freedom from all duties . . . ." 29 C.F.R. § 785.23.

The Eighth Circuit has considered several cases involving the homeworker's exception, none of which is entirely analogous to this case. In *Gaby v. Omaha Home for Boys*, 140 F.3d 1184 (8th Cir. 1998), the Eight Circuit considered a FLSA complaint by several "house parents" who worked in a group home for boys. The plaintiffs lived in the home around the clock in six-day shifts with three days off in between. *Id.* at 1186. They were expected to be on duty ten hours per day during their shifts and consequently received forty hours of regular pay and twenty hours of overtime pay per six-day shift. *Id.* Rejecting the plaintiffs' argument that the job required more than ten hours of work per day, the Eighth Circuit held that

[t]he relationship between the house parents and the Home is exactly the type of employment dealt with in § 785.23. The house parents lived at the facility for extended periods of time. . . . [W]ith two house parents, one person was often sufficient to

6

respond to the occasional demand or problem. This allowed the other parent to "engage in normal private pursuits." 29 C.F.R. § 785.23. Thus it was possible to "cover" well over ten hours of activity a day. Moreover, and most significantly, demands for attention were intermittent, allowing private activities frequently and for extended periods during a 24-hour day.

*Id.* at 1187.

In *Rudolph v. Metropolitan Airports Comm'n*, 103 F.3d 677 (8th Cir. 1996), a case filed by off-duty airport police officers who received one half-hour's pay per day for housing and caring for police dogs at home, the Eighth Circuit held the homeworker's exception applicable because

[t]he employer cannot easily determine how long the officers work at home caring for the dogs. Dog care–feeding, grooming, cleaning cages or pens, and exercising–may take more time on one day than on others. It may be spread out, sporadic in nature. An officer might feed a dog when they first get home, give the dog water later, and perform other care still later. The indeterminate nature of these tasks, we think, makes them exactly the sort of work as to which it makes sense for the parties to come to an agreement, to eliminate complicated, repetitious, and hard-to-resolve disputes about exactly how much time it took to take care of the dogs each day.

*Id.* at 681. Although they are not directly analogous to the case at hand, these decisions make clear that the most important factors in determining the applicability of 29 C.F.R. § 785.23 are the uncertainty of time actually worked, the intermittent nature of the employment obligation, and the existence of periods of free time for the employee to engage in personal pursuits.

The Fifth Circuit's decision in *Halferty II*, 864 F.2d 1185 (5th Cir. 1989) (cited with approval by the Eighth Circuit in *Rudolph*, 103 F.3d at 681) provides the

7

clearest analogy to the present case. In *Halferty II,* the plaintiff worked from her

home as an ambulance dispatcher. *Id.* at 1187. Like Bennett, Halferty was

responsible for answering the phones from 5:00 pm to 8:00 am five nights per week.

*Id.* During times when there were no calls, she was free to "eat, sleep, watch

television, entertain guests, babysit, and do laundry." *Id.* Applying the

homeworker's exception to deny Halferty's claim for overtime compensation, the

Fifth Circuit held:

> The regulation does not require employees to have complete freedom
> during on duty time; the courts that have cited § 785.23 have looked to
> both on-duty time and off-duty time when evaluating an employee's
> freedom. This must be done because Halferty–unlike many employees
> to whom § 785.23 might apply–did not reside on her employer's
> premises. The work premises were her home. Halferty had complete
> freedom during the day and, even while on duty at night, she had
> enough time for eating, sleeping, and entertaining. This is all the
> freedom that § 785.43 and the homeworker's exception require.

*Id.* at 1190-91 (citations omitted).

Bennett's work responsibilities were nearly identical to Halferty's work

responsibilities. Both Bennett and Halferty worked out of their own homes. Both

were responsible for answering phones and dispatching drivers from 5:00 pm to 8:00

am four or five nights per week. Both were free when not answering calls to sleep,

eat, crochet, watch television, or otherwise engage in periods of leisure activity. Both

were free during the daytime hours to do as they pleased, so long as they were able to

perform their job during the evening.        Without persuasively distinguishing

*Halferty*, Bennett claims that the homeworker's exception does not apply to her and

8

asserts there are disputed issues of fact which preclude summary judgment. According to Bennett, the following issues are unresolved: whether Carl's Towing negotiated with Bennett as to her wages or simply dictated them to her; whether Bennett was allowed to have company during her evening shifts; whether Bennett was allowed to sleep during her evening shifts; and whether Bennett worked four or five night shifts per week between June 19, 2001 and December 31, 2002. Having considered the record, the Court concludes that Bennett has either not introduced evidence to show that a genuine dispute exists or the evidence produced is insufficient as a matter of law to find the homeworker's exception inapplicable.

First, the number of shifts she worked during the week is immaterial to the question of whether the entirety of each shift was work time. Second, Bennett concedes that even if McMeans set her pay rate without any negotiation, her acquiescence over three years "created an implied agreement between the parties as to her hours and her pay rate." Pl.'s Sugg. in Supp. of Pl.'s Mot. for S.J. 12. Third, while Bennett asserts in her Suggestions in Opposition to the Defendant's Motion for Summary Judgment that she was expected to stay awake and not allowed to sleep (citing Bennett Dep. 109:7-17, 110:3-6), her uncontroverted facts in support of her own Motion for Summary Judgment state that she could sleep if she did so lightly enough to hear the telephone ring (citing Barb McMeans Dep. 25:5-9, 29:21-25). As to the issue of whether Bennett was allowed to have company during her night shifts, her deposition testimony is ambiguous. At one point, in response to a question

9

about whether she received any job instructions, Bennett testifies: "Did they give me instructions? Not exactly. They would call me – well, I guess you would call it instructions. I was not to have company. . . ." Bennett Dep. 109:11-14. But later, when asked, "While you were working for Carl's on one of the nights that you had the dispatcher responsibilities, did you ever have anybody come by and visit?" Bennett responded, "Yeah, I had people that would come by, yes." Bennett Dep. 136:9-14. Barb McMeans also testified in deposition that when she called Bennett during her night shifts, she heard "so much noise in the background from company there." Barb McMeans Dep. 24:7-10. Carl McMeans denies that he ever told Bennett she could not have company, though he would not have let her have a party because it would have made it hard to hear the phones. McMeans Dep. 44:22 to 45:20. Finally, Don Forden, another night dispatcher at Carl's Towing, testified in deposition that he frequently had company on nights when he had dispatching duties, and that he could basically do as he pleased so long as he could hear the phone ring. Forden Dep. 20:22 to 24:2. Given this record, it is unlikely that a reasonable jury could find that Bennett was not able to have company during her shift. However, even if there is a theoretical question of fact concerning restrictions on company, any limitation on Bennett in this limited regard is insufficient to demonstrate that the homeworker's exception does not apply. The totality of the circumstances must be considered, not one isolated restriction.

      In addition to the foregoing specific issues, Bennett asserts generally that she

was not free to engage in normal private pursuits at any time during her fifteen-hour shifts. *Id.* at 14. In light of the evidence offered by both parties, the Court finds this claim unsupported by the evidence. Bennett testified that she received ten or so calls per night on average, and that each call lasted about thirty minutes. In fact, she lists her nightly average phone time of four to five hours as an undisputed fact in paragraph 46 of her Suggestions in Support of her own Motion for Summary Judgment. During her deposition, she also read her log book entries from a "typical night," in which she received calls at 5:20 p.m., 5:33 p.m., 5:53 p.m., 6:38 p.m., 7:00 p.m., 7:10 p.m., 7:57 p.m., 8:06 p.m., 8:37 p.m., 9:11 p.m., 9:43 p.m., 10:06 p.m., 11:34 p.m., 12:02 a.m., 6:36 a.m., 7:24 a.m., and 7:39 a.m. Seventeen calls in one night is more than average to which she testified, and yet this "typical night" indicates a six-hour block, from 12:02 a.m. to 6:36 a.m., during which she received no calls. Furthermore, Bennett testified that when she wasn't answering the phone, she would watch TV, crochet, or sleep. While she wasn't free to leave the house or do the laundry, or perhaps have invited company, she could and did do many other personal activities during the week nights.

Bennett relies on a series of cases and tests to argue that the homeworker's exception is inapplicable to her, but almost all of the cases cited deal with "on-call" employees rather than "homeworkers," each of which has its own DOL regulation. *Compare* 29 C.F.R. § 785.14 (2005) *with* 29 C.F.R. § 785.23 (2005).

She first invokes the "twin cases" of *Armour & Co. v. Wantock*, 323 U.S. 126

11

(1944) and *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), two Supreme Court opinions issued on the same day, both involving off-duty firefighters who remained "on-call" at night. In *Armour*, the Court held that "time spent lying in wait for threats to the safety of the employer's property *may* be treated by the parties as a benefit to the employer. Whether time is spent predominantly for the employer's benefit or for the employee's is a question dependent upon all the circumstances of the case." 323 U.S. at 133 (emphasis added). In *Skidmore*, the Court was even more tentative, opining that "[f]acts may show that the employee was engaged to wait, or they may show that he waited to be engaged. His compensation may cover both waiting and task, or only performance of the task itself." 323 U.S. at 137. Bennett quotes only the first sentence from *Armour*, analogizing her waiting for the phone to ring to the firefighters' waiting for a fire alarm. She overlooks, however, the fact-dependent nature of the inquiry in *Armour*, and *Skidmore*. Most importantly, neither case considers or even mentions the homeworker's exception because it had not yet been codified by the DOL as a class distinct from other "on call" employees.

Next, she seeks support from a Ninth Circuit case, *Berry v. County of Sonoma*, 30 F.3d 1174, 1183 (9th Cir. 1994), but *Berry* dealt with overtime pay for "on-call" coroners who neither worked in their homes nor lived on their employers' premises. Bennet then cites three other on-call cases, *Reimer v. Champion Healthcare Corp.*, 258 F.3d 720 (8th Cir. 2001), *Cross v. Arkansas Forestry Commission,* 938 F.2d 912 (8th Cir. 1991), and *Renfro v. City of Emporia*, 729 F. Supp. 747 (D. Kan. 1990),

12

none of which is governed by or even mentions the homeworker's exception.

Instead, all of those cases deal with and are governed by 29 C.F.R. § 785.17 ("on-call time") instead of 29 C.F.R § 785.23. The tests and factors cited in Bennett's Suggestions might be applicable to the tow truck drivers themselves, but not to a dispatcher working at home. *See Halferty v. Pulse Drug Co.,* 821 F.2d 261, 269 n.8 (5th Cir. 1987) (*Halferty I*) ("These sections [785.14-.17] are designed to deal with employees who do not either reside on the employer's premises or work at their houses. For example, this would appear to cover the Pulse Ambulance drivers.").

The only homeworker's exception case Bennett discusses at any length is *Rudolph*, 103 F.3d 677, which she tries to distinguish on the grounds that the employers in *Rudolph* could not easily determine the number of hours officers cared for police dogs at home. She argues that it was much easier to determine how much time she worked each night because her whole shift was work time. This merely restates her global conclusion that the entire fifteen hours were devoted exclusively, or even primarily, to her employer--a conclusion unsupported by the record.

In *Halferty II*, 864 F.2d 1885, which is factually analogous, the Fifth Circuit clearly distinguished between those who are engaged to be waiting (i.e. those who must be compensated for idle time under 29 C.F.R. § 785.14-.17) from those who are waiting to be engaged (i.e. those covered by the Homeworker's exception of 29 C.F.R. § 785.23). The Fifth Circuit first reviewed Halferty's employment under 29 C.F.R. § 785.14-17, but concluded that "[n]one of these sections apply directly to the

13

present case because none of them address homeworkers in the precise position of Halferty." *Halferty II*, 864 F.2d at 1189 n.4. Turning instead to the homeworker's exception, the Fifth Circuit held:

> Section 785.23 makes clear that when an employee has such freedom, and when it is "difficult to determine the exact hours worked," an employer can pay the employee according any reasonable agreement that takes into consideration all of the pertinent facts. 29 C.F.R. § 785.23. In this case, Pulse could not have determined, except in an intrusive manner, the exact amount of time that Halferty spent dealing with telephone calls and dispatching ambulances.

*Id.* at 1191.

Bennett's own testimony suggests that, on average, she was on the phone receiving calls for her employer four to five hours a night, or only one third of the time during each fifteen-hour shift. Like the plaintiffs in *Halferty II, Gaby,* and *Rudolph*, she was substantially free to follow her own pursuits the rest of the time–eating, crocheting, watching television, or sleeping. Also, as in those cases, it would be difficult for Carl's Towing to determine the exact hours Bennett worked each night.[1] For these reasons, this Court finds that Bennett's weeknights as a dispatcher fall squarely within the homeworker's exception.

---

[1] Bennett suggests that Carl's Towing would only have to look at the log books to determine how many hours Bennett actually worked per night. This is only partially true. Although most calls were recorded when they are received, only those calls from AAA required a "close out" time. Barb McMeans Dep. 9-11. Furthermore, this argument is self-defeating. Bennett testified that she was only on the phone an average of four to five hours per night. Had McMeans actually paid her only for the "easily calculable" time recorded in her log books, she would have received only twenty hours of pay per week instead of forty.

14

### b.　　Reasonableness of the Agreement

The second question is whether the parties had a "reasonable agreement" as to Bennett's compensation for her shifts. Although she asserts a dispute of material fact as to whether the parties originally had a compensation agreement at all or whether compensation was simply set by Carl's Towing, Bennett acknowledges that at some point her acquiescence suggests at least an implied agreement. See Pl.'s Sugg. in Supp. of Pl.'s Mot. for S.J. 12. According to her own Motion for Summary Judgment, Bennett received an average of ten calls per night, each of which lasted for an average of thirty minutes. Pl.'s Sugg. in Supp. of Pl.'s Mot. for S.J. 23. Thus, she spent about five hours per night, or twenty-five hours per week, answering the phones, but she was paid for eight hours per night or forty hours per week. No reasonable juror could conclude that an agreement compensating Bennett for 160 percent of the time she actually worked is somehow unreasonable.

In an attempt to overcome this logical wrinkle, Bennett argues that the fact that her pay was based on twice as many hours as she actually spent on the phone demonstrates that the parties intended her to be paid for her waiting time. Because there is no correlation between the hours worked by Bennett and the payment received, it would be random speculation to infer any intent on the part of Carl's Towing. There is certainly no logical basis for concluding that because Bennett's employer over compensated her for fifteen hours, the employer intended to double her compensation yet again from forty hours to seventy-five.

Finally, in an effort to claim that their agreement was unreasonable, Bennett argues that it was not based on a realistic evaluation of what her actual time demands would be. This argument fails for two reasons. First, it assumes that the management of Carl's Towing had no experience with their own dispatching operation from which to estimate a reasonable amount of nightly telephone traffic. Given that the number of calls directly affects the company's bottom line, it is unlikely that Carl McMeans had no idea how many calls would come in per night. Secondly, Bennett claims that there was no reasonable investigation because McMeans did not look at the log books. As noted above, this argument is self-defeating: had he based Bennett's compensation on the number of entries in the log books, he would have reduced her wages, not increased them. Weighing the evidence in a light most favorable to the plaintiff, no reasonable juror could conclude that the arrangement was unreasonable.

For the foregoing reasons, the Court finds that Bennett's evening shifts as a phone dispatcher for Carl's Towing fall within the homeworker's exception as codified in 29 C.F.R. § 785.23, and further that she has already been compensated under a reasonable agreement. Therefore, the Court grants Carl's Towing's Motion for Summary Judgment with Respect to Plaintiff's Claim for Overtime Compensation for Her Home-based Dispatching Work.

### c.    Willfulness

Even though the Court has granted Defendant's Motion for Summary

16

Judgment with respect to its liability for Bennett's weeknight shifts, it must still consider the issue of willfulness for statute of limitations purposes with regard to Bennett's weekend dispatching work. Because the Court finds a genuine dispute of material fact as to whether Carl's Towing willfully violated the FLSA, Summary Judgment on the issue of willfulness is denied.

Suits under the FLSA must be commenced within two years "except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued." 29 U.S. C. § 255(a) (2005). This two-tiered statute of limitations "makes it obvious that Congress intended to draw a significant distinction between ordinary violations and willful violations." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 132 (1988). Thus, to qualify for the three-year statute of limitations; *i.e.*, to prove that the Defendant's conduct was "willful," the Plaintiff must prove that the employer either knew or showed reckless disregard for whether its conduct was prohibited by the statute. *Id.* at. 133. Neither a negligent violation, nor a mere failure to seek legal advice regarding a pay practice constitute a "willful" violation. *Id.*

In the present case, the Court finds that summary judgment is inappropriate because there is evidence from which a reasonable jury could infer a willful violation of the FLSA. The original rate Carl McMeans set for Bennett's weeknight shifts ($40 per day) was augmented when his payroll company told him he had to at least pay her minimum wage; however, even after this advice from payroll, Carl's Towing

17

maintained the $40/day rate for her weekend shifts.  Additionally, Carl's Towing paid Bennett for her weekend shifts in cash and off the books.  In considering motions for summary judgment, the Court must construe all facts in a light most favorable to the non-moving party and draw all favorable inferences thereto.  Since the uncompensated pay at issue in this case stems from unrecorded weekend shifts that were paid below the rate the payroll company told McMeans was the minimum allowed, the Court cannot say as a matter of law that Carl's Towing did not act willfully in violating the FLSA.  However, because there is evidence that Carl's Towing maintained Bennett's wage scheme at her request; i.e., to avoid cutting into her disability benefits, the Court cannot say as a matter of law that the Defendant acted willfully either.  Instead, the question of willfulness is a proper question for a jury.  Accordingly, Summary Judgment on the issue of willfulness for statute of limitations purposes is denied.

### d.    Liquidated Damages/Bad Faith

Even though the Court has granted Defendant's Motion for Summary Judgment with respect to its liability for Bennett's weeknight shifts, it must still consider the issue of good faith for liquidated damages purposes with regard to Bennett's weekend dispatching work.  Because the Court finds the same genuine dispute of material fact here as it did with the issue of willfulness, summary judgment on the issue of good faith is denied.

An employer who violates the overtime provisions of the FLSA "shall be

18

liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages." 29 U.S.C.S. § 216(b) (2005). An award of liquidated damages under section 216(b) is mandatory unless the employer can show good faith. *Braswell v. City of El Dorado*, 187 F.3d 954, 957 (8th Cir. 1999). Indeed, the district court's decision whether to award liquidated damages does not become discretionary until the employer carries its burden of proving good faith. *Id. (quoting Joiner v. City of Macon*, 814 F.2d 1537, 1539 (11th Cir. 1987)).

In the present case, Carl's Towing has not yet met its burden. As indicated in the discussion of willfulness above, there is evidence suggesting that Carl's Towing maintained Bennett's wages in order to preserve her disability payments at their existing levels; however, in view of the off-the-books cash payments and the failure to raise her weekend pay rate, even after being told that her weeknight rate was too low, a reasonable jury could conclude that Carl's Towing did not act in good faith. Because the Court finds there to be a genuine dispute of material fact here, summary judgment on the issue of good faith for liquidated damages purposes is denied.

### B.    Bennet's Motion for Summary Judgment

Also pending before the Court is Bennett's Motion for Summary Judgment on her claim for unpaid overtime compensation and for overall compensation below the minimum wage mandated by the Fair Labor Standards Act, 29 U.S.C. §§ 201 et seq. ("FLSA"). For the reasons stated above, the Court has granted Defendant's Motion

for Summary Judgment with Respect to Plaintiff's Claim for Overtime Compensation for Her Home-based Dispatching Work. For those same reasons, the Court denies Plaintiff's Motion for Summary Judgment with respect to overtime compensation for her home-based dispatching work. However, because both parties agree that Bennett was paid less than the minimum wage for her weekend dispatching work, and because at least part of those weekend shifts was in excess of the forty-hour work agreement the parties had with regard to Bennett's weeknight dispatching work, the Court grants Plaintiff's claim for overtime compensation and overall compensation below the minimum wage with regard to her weekend dispatching work performed at Carl's Towing's office.

Although there may be some disagreement as to how often Bennett worked five nights a week as a home-based dispatcher between June 2001 and December 2002, both parties agree that Bennett worked at least four nights a week from June 2001 until May 2004. The parties also agree that Bennett worked as a dispatcher at Carl's Towing's office on Saturdays and Sundays from 8:00 a.m. to 5:00 p.m. The parties further agree that she was paid $40 cash per nine hour weekend day shift that she worked. And, the parties agree that Bennett was paid for forty hours of work per week at $5.15 per hour for her weeknight home-based dispatching shifts on weeks in which she worked five nights.[2]

---

[2]On weeks that she worked less that five weeknight shifts, she was paid $41.20 per night, or eight hours at minimum wage per night.

Case 2:04-cv-04222-NKL    Document 41    Filed 08/31/05    Page 20 of 24

The FLSA mandates that covered employers pay their workers a minimum hourly wage of $5.15 for the first forty hours worked per week, 29 U.S.C. § 206(a)(1) (2005), and an overtime rate of at least one and one half times the hourly rate for any additional hours, 29 U.S.C. § 207(a)(1) (2005). To establish a violation of the minimum wage requirements of the FLSA, a plaintiff must demonstrate (1) that she was engaged in compensable activity within the meaning of the statute and (2) that the wages received for that activity, if any, were below the statutory minimum wage. *Hensley v. MacMillan Bloedel Containers, Inc.*, 786 F.2d 353, 355 (8th Cir. 1986). The "homeworker's" exception, now codified at 29 C.F.R. § 785.23 (2005), "may allow an employer to pay an employee according to a reasonable compensation agreement instead of the FLSA's specific hourly rate requirements when the employer cannot determine the exact hours that the employee works." *Halferty v. Pulse Drug Co.*, 864 F.2d 1185, 1189 (5th Cir. 1989) (*Halferty II*). It was under this exception that Carl's Towing paid Bennett for forty hours at minimum wage for her home-based weeknight dispatching work.

Since Bennett's weekend shifts were performed at Carl's Towing's office rather than at her home, and since Bennett does not live on Carl's Towing's premises, her weekend shifts do not fall within the homeworker's or any other exception to the FLSA. Thus, any agreement as to her compensation for those shifts, reasonable or otherwise, must conform with both the minimum wage and the overtime provisions of the FLSA. The parties do not dispute that Bennett performed compensable work for

Carl's Towing as its office dispatcher on Saturday and Sunday. Nor do the parties dispute that Bennett was paid $40 cash per each nine hour weekend shift. The Court therefore finds that Bennett is entitled to summary judgment on her Complaint that Carl's Towing is liable to her for weekend hours compensated below the minimum wage.

Bennett also contends that any weekend hours beyond forty are entitled not only to minimum wage but to overtime compensation since the agreement under which she was paid for her home-based dispatching work assumed she had worked at least thirty-two hours (and sometimes forty) per week before the start of her Saturday and Sunday shifts. To meet her burden of proof in an action for overtime pay, a plaintiff must show by a preponderance of the evidence that she worked overtime hours without compensation, the amount and extent of the work as a matter of just and reasonable inference, and that the defendant knew of the uncompensated overtime. *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946). In the present case, there is no factual dispute that Bennett worked in excess of forty hours per week: both parties agree that she worked at least thirty-two hours during the week and eighteen more on the weekend.[3] Similarly, there is no dispute that Bennett was not

_____

[3]Again, the extent of her overtime pay depends on whether she worked four or five night shifts. But even when Bennet worked only four night shifts, she was still paid for thirty-two hours of work. Thus, after the first eight hours of her weekend work, she should have been paid at an overtime rate for the rest. Moreover, Carl's Towing cannot claim to have paid Bennett under a special agreement within the "homeworker's" exception without also counting the hours assumed in that agreement toward her weekly total.

22

compensated for overtime: she received $40 cash per nine-hour weekend shift irrespective of how many hours she worked during the week. Finally there is no dispute that Carl's Towing was aware of the hours Bennett worked each weekend. Consequently, the Court finds as a matter of law that Carl's Towing is liable to Bennett for weekend hours compensated below the minimum wage and for weekend overtime hours which were compensated at less than one and one half times her regular pay. The exact amount of unpaid compensation cannot be determined on this record.

For the foregoing reasons, the Court grants Bennett's Motion for Summary Judgment with respect to her claim for overtime compensation and overall compensation below the minimum wage with regard to her weekend dispatching work performed at Carl's Towing's office.

III.    **Conclusion**

Accordingly, it is hereby ORDERED that:

1.      Carl's Towing's Motion for Summary Judgment [Doc. # 31] is GRANTED in part and DENIED in part, and

2.      Bennett's Motion for Summary Judgment [Doc. # 33] is GRANTED in part and DENIED in part.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

DATE:  August 31, 2005

23

Jefferson City, Missouri

Case 2:04-cv-04222-NKL   Document 41   Filed 08/31/05   Page 24 of 24